**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JOHN DOE,
*Defendant-Appellant*.

No. 11-10067

D.C. No.
1:08-cr-00254-
LJO-1

OPINION

On Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
November 7, 2012—San Francisco, California

Filed January 31, 2013

Before: Ferdinand F. Fernandez and Marsha S. Berzon,
Circuit Judges, and William E. Smith, District Judge.[*]

Opinion by Judge William E. Smith

---

[*] The Honorable William E. Smith, District Judge for the U.S. District
Court for the District of Rhode Island, sitting by designation.

## SUMMARY[**]

---

### Criminal Law

The panel affirmed the district court in part and reversed in part, vacated convictions on drug charges, and remanded for further proceedings in a case in which the defendant alleged errors relating to the public authority defense, Sixth Amendment violations, discovery violations, and procedural errors at sentencing.

The panel that the district court was correct in applying *Dixon v. United States*, 548 U.S. 1 (2006), to the defendant's public authority defense, and thus that the district court's determination that the defendant bore the burden of proof by a preponderance of the evidence was proper. For that reason, the panel held that the defendant was not denied his Sixth Amendment right to the assistance of counsel when the district court prohibited him from arguing a different burden and standard of proof during closing arguments. The panel held that the district court did err when it failed to instruct the jury at all on the proper burden and standard of proof for the public authority defense, but that the error was not plain.

The panel held that the district court abused its discretion in denying two discovery requests as overbroad and immaterial. Because the record is unclear as to what would have been produced if those requests had been granted and what effect the production would have had on the outcome of the trial, the panel vacated the conviction and remanded for

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

either an evidentiary hearing or *in camera* review to further address the discovery and *Brady* issues.

The panel held that the sentencing hearing contained numerous procedural violations: the district judge failed to accurately state the Sentencing Guidelines range at the onset, never gave the parties the opportunity to argue for a sentence they believe is appropriate, and failed to adequately address the defendant's objections to the presentence report, as required by Fed. R. Crim. P. 32(i)(3)(B). The panel held that the cumulative effect of the violations amounted to plain error, requiring that the sentence be vacated.

---

### COUNSEL

Carolyn M. Wiggin, Assistant Federal Defender, Sacramento, California, for Defendant-Appellant.

Kathleen A. Servatius, Assistant U.S. Attorney, Fresno, California for Plaintiff-Appellee.

## OPINION

WILLIAM E. SMITH, District Judge:

Defendant-Appellant John Doe[1] appeals his conviction, following a jury trial, of conspiracy to distribute methamphetamine, conspiracy to distribute cocaine, possession of methamphetamine with the intent to distribute, and possession of cocaine with the intent to distribute. On appeal, Doe raises a host of alleged errors which fall into four general categories:  errors relating to Doe's public authority defense, Sixth Amendment violations, discovery violations, and procedural errors at Doe's sentencing.

Regarding the alleged public authority errors, we hold that the district court was correct in ruling that *Dixon v. United States*, 548 U.S. 1 (2006), applies to Doe's public authority defense. Thus, Doe had the burden of establishing the defense by a preponderance of the evidence, and it was not error for the district court to refuse to instruct the jury otherwise. While we find that the district court gave an incomplete and therefore erroneous jury instruction on public authority when it neglected to instruct the jury that Doe bore this burden, Doe never raised the issue before the district court, and the error does not rise to the level of plain error. Accordingly, we affirm the district court with respect to all alleged errors regarding Doe's assertion of the public authority defense.

---

[1] Throughout this prosecution, Defendant-Appellant has been concerned for his safety, and as a result, the pseudonym John Doe has been substituted for his name. To further protect his identity, the names of all officers, informants, and co-conspirators have also been omitted to the extent possible.

Doe's second claim, which alleges a Sixth Amendment violation, essentially raises the same argument as the alleged public authority defense errors, just dressed up in different clothes. For the same reasons as with regard to the public authority defense, we hold that the district court did not deprive Doe of his Sixth Amendment right to counsel when it prevented him from arguing an incorrect burden of proof to the jury during his closing argument.

The third category of errors claims discovery and *Brady* violations. We hold that the district court abused its discretion in denying Discovery Requests Five and Six as overbroad and immaterial; however, the record is unclear as to what, if anything, would have been produced if those requests had been granted and what effect, if any, the production would have had on the outcome of Doe's trial. Accordingly, we must vacate Doe's conviction and remand to the district court for further proceedings (either an evidentiary hearing or *in camera* review) to further address these discovery and *Brady* issues.

The fourth and final category of errors allege procedural violations at sentencing. We agree with Doe that his sentencing hearing contained several procedural violations which cast doubt on the reasonableness of his ultimate sentence. Consequently, assuming the evidentiary hearings discussed above result in the reinstatement of Doe's conviction, his sentence is vacated and he must be resentenced.

**Background**

**A**

In early 2008, Doe, a resident of Mexico, contacted the Federal Bureau of Investigation (FBI) regarding information on drug-related activity. He first met with an agent on April 15, 2008. At this meeting, Doe described a cell, as well as individuals, who were involved in trafficking narcotics between Mexico and the United States. He provided telephone numbers and offered to give the agent the addresses and license plate numbers of these individuals. In exchange, Doe wanted the FBI to allow him and his family to immigrate to the United States and either be given new identities or be placed in witness protection. The agent explained that Doe was "putting the cart before the horse," and while such requests were sometimes granted, this occurred only after long and successful records of cooperation with the FBI that resulted in prosecutions and convictions.

Approximately one month after this initial meeting, the two met again in a San Diego parking lot. At this meeting, Doe repeated his request to come to the United States, but the agent represented that Doe had not yet provided the information requested in their initial meeting.[2] Over the next few months, Doe and the agent remained in contact, and the agent began the process within the agency of qualifying Doe as a potential confidential informant. At no point did the

---

[2] Doe testified that he provided the agent with vehicle information, license plate numbers, telephone numbers, and the name "Indio" - one of the heads of a 500+ person narcotics cell. The agent testified that he had no recollection of Doe providing this information.

agent authorize Doe to engage in illegal activity either on his own behalf or on the FBI's behalf.

Meanwhile, a detective of the Fresno Police Department was conducting a drug-trafficking investigation into an individual known as "Colima." As part of this investigation, the detective and two informants were referred by Colima to Doe. Doe told one of the informants that he would "be able to get what you guys need." On July 21, 2008, the detective and the informants spoke on the telephone with Doe and arranged a sale of twenty kilograms of cocaine; Doe advised them not to use any names in future communications. The next day, the detective met with Doe but no drug transactions occurred. Later that afternoon, Doe called one of the informants, telling him that he (Doe) could not get the cocaine but he knew somebody in Dinuba (the "Dinuba Contact") who could get ten to twelve pounds of crystal methamphetamine if the informant was interested. The informant indicated his interest, so Doe placed the informant in contact with the Dinuba Contact. Once the methamphetamine deal was completed on July 25, 2008, the Dinuba Contact was arrested and twelve pounds of methamphetamine seized.

Three days later, on July 28, 2008, Doe again spoke with one of the informants and told the informant that he could now provide the cocaine in two ten-kilogram shipments. The informant and the detective arranged for a car exchange with Doe to complete the cocaine sale. When the prearranged meeting time arrived, Doe, the detective, the informants, and other associates of Doe were present. For reasons that are unclear, the car exchange did not take place. Instead, one of the informants and one of Doe's associates traveled to an auto body shop where the informant saw the cocaine. The two

men then returned to the original meeting place, and Doe and his associates were arrested. A subsequent search of the body shop uncovered five kilograms of cocaine.

Immediately following his arrest, Doe told the detective that he was an informant working with the FBI. The detective asked if Doe was working with the FBI on this specific case, and Doe said no. The detective nevertheless followed up on Doe's statement and contacted the FBI agent, who told the detective that Doe was being developed as a confidential informant but was not currently working for them. The detective proceeded to complete the arrest and, on August 7, 2008, the government filed the four-count indictment against Doe.

**B**

In the lead-up to trial, Doe filed numerous discovery requests and motions. The motion at issue in this appeal, filed on March 20, 2009, asked the district court to order the government to produce Rule 16 discovery and *Brady v. Maryland* evidence. Specifically, Doe requested:

> 5. Any and all records or reports which document any and all telephone numbers, license plate numbers, or individuals, provided or identified by [Doe] to FBI [agents], as being associated, involved or related to criminal activity; ["Request Five"]

> 6. Any and all records, reports or calendars which document the date of any meeting or communication, or planned meeting or

communication between [Doe] and FBI
[agents]; ["Request Six"]

Doe argued that Request Five was necessary to show that he
was predisposed to assist law enforcement and not to commit
the alleged acts; Request Six, meanwhile, was needed to
prepare and put forth an entrapment defense. The district
court denied these requests as overbroad, ruling that the
"Court cannot determine whether the requests do or do not
fall within the express words of Rule 16(a)(1)(E)(i)."

Prior to trial, Doe informed the court that he would be
presenting a public authority defense and requested the
following jury instruction:

> If a defendant engages in conduct that
> violates a criminal statute, in reliance on a
> statement or act of a government official, with
> the reasonable belief that the defendant is
> acting as an authorized government agent to
> assist in law enforcement activity, then the
> defendant may not be convicted of violating
> the criminal statute, because the requisite
> intent is lacking. The government must prove
> beyond a reasonable doubt that the defendant
> did not have a reasonable belief that he was
> acting as an authorized government agent to
> assist in law enforcement activity at the time
> of the offense charged in the indictment.

The government objected to this instruction, arguing that the
Supreme Court's recent holding in *Dixon v. United States*
required Doe to prove his defense by a preponderance of the
evidence. The district court agreed, ruling that *Dixon* applied

because the public authority defense would not negate any of the elements of the charged crimes.

Trial began on October 26, 2009. The theme of Doe's defense was essentially "yes, I helped arrange these sales, but I did so only to gain information to give to the FBI so my family and I could move to America." To support this argument, Doe testified that on July 19, 2008, after the informants approached him, he called the agent and told him that they needed to meet as soon as possible because Doe had information to relay. According to Doe, a meeting was scheduled for either July 29 or July 30; he could not remember exactly which date. The agent had no recollection of this phone call, despite being presented with phone records confirming an eighty-four second direct-connect call from Doe to the agent on July 19, 2008. He also denied setting up a meeting with Doe for either July 29 or 30. Following this alleged phone conversation, Doe never contacted, or attempted to contact, the agent again.

On October 29, 2012, at the close of evidence but prior to closing arguments, the district judge gave the jury its final instructions. The judge began by stating that the "government has the burden of proving every element of the charges beyond a reasonable doubt" and then proceeded to define reasonable doubt. Regarding public authority, the court adopted the government's proposed instruction, telling the jury that:

> If a person engaged in conduct that violated a criminal statute, in reliance on a statement or act of a government official, with a reasonable belief that the defendant is acting as an authorized government agent to assist in

> law enforcement activity, then the defendant
> may not be convicted of violating the criminal
> statute.

Doe did not request that the district court instruct the jury that Doe bore the burden of proof for the defense or that the standard of proof was by a preponderance of the evidence. Rather, before presenting his closing, Doe informed the court that it was his intention to argue "that the government is required to prove beyond a reasonable doubt that [Doe] was not acting with the reasonable belief he was acting as an authorized government agent." The district court forbade this line of argument, responding, "No, that's not their responsibility. . . . Their responsibility is only to prove the case beyond a reasonable doubt as to the elements of the crime." Doe answered "okay." The jury returned guilty verdicts on all counts.

## C

Almost one year later, on October 8, 2010, Doe moved for a new trial, arguing newly discovered evidence and a *Brady* violation. In the motion, Doe pointed out that he had testified that he told the FBI agent about a drug trafficker named "Indio." Following Doe's conviction, Doe reported, "Indio" was arrested and accused of being a key member of the Beltran Leyva cartel and trafficking methamphetamine and other drugs between Mexico and the United States. According to Doe, the investigation and arrest of "Indio" should have been disclosed to him. The district court disagreed and denied the motion on January 28, 2011, finding that Doe never mentioned "Indio" in any request for discovery and that, even if Doe's requests had encompassed information on "Indio," the government's position was that

it did not have any information that Doe ever provided the FBI with anything related to an "Indio." The district court therefore concluded that no evidence was "suppressed" and no *Brady* violation occurred. It further held that "there is nothing to suggest that this fact would have or could have suggested to any trier of fact that it was reasonable for [Doe] to somehow believe that it was all right [sic] to sell drugs simply because an FBI agent told him that the defendant . . . lacked specific information to be a valuable informant and that a benefit would only be conferred upon him after a long and productive relationship."

## D

In preparation for sentencing, a Presentence Investigation Report ("PSR") was prepared. The PSR grouped the four convictions together, converted the methamphetamine and cocaine weights to a marijuana equivalency weight, added the weights together, and arrived at a total marijuana equivalence weight of 106,040 kilograms. According to the United States Sentencing Guidelines Manual (the "Guidelines"), Doe's base offense level was 38. The PSR recommended a two-level increase under § 3B1.1(c) of the Guidelines because Doe "made arrangements for the distribution of methamphetamine . . .[,] utilized a co-conspirator in his distribution activities. . . . [and] paid or gave this individual a small portion of the profits for his efforts," and was thus the organizer of the criminal endeavor. The PSR also recommended that Doe not receive a two-level reduction for acceptance of responsibility under § 3E1.1(a) of the Guidelines because he did not enter into a plea agreement. Taking these adjustments into account, the PSR calculated Doe's total offense level to be 40. With a Category I Criminal History and a total offense level of 40, Doe's

Guidelines range was between 292 and 365 months imprisonment. The PSR recommended 292 months in prison, sixty months of supervised release, and a $400 special assessment.

Doe filed objections to the PSR, specifically finding fault with the two-point organizer enhancement and the denial of a two-point reduction for acceptance of responsibility. He further argued that he was entitled to a four-point reduction in the Base Offense Level for playing a mitigating role under Guideline § 2D1.1(a)(5), a four-point reduction for being a minimal participant under § 3B1.2(a), and a two-point reduction for qualifying as a safety-valve candidate.

On January 28, 2011, the district court sentenced Doe. The judge stated that "[t]he Court notes that the applicable offense level is 38, Criminal History Category is I. Guideline range is 292 to 365, with a Probation recommendation of 292 concurrently as to each of the four counts. The Court has considered the 3553(a) factors." Then, the judge questioned the parties regarding the disparity between the PSR's recommendation and the eighty-four month sentence of Doe's co-defendant, the Dinuba Contact. The government explained that the Dinuba Contact pleaded guilty, did not recruit other individuals, and was not involved in the cocaine transaction, and therefore received the acceptance of responsibility and safety-valve reductions for which Doe did not qualify. Doe disputed this characterization, arguing that the Dinuba Contact, and not Doe, was the organizer. The district court did not explicitly resolve this dispute. Instead, the court changed topics and proceeded to question the parties on Doe's acceptance of responsibility objection, finding that Doe was not entitled to the reduction. The judge then adopted the PSR's recommendation and sentenced Doe to

concurrent terms of 292 months imprisonment on each count, followed by a period of sixty months supervised release, and a $400 special assessment.

## Discussion

## I.  The Public Authority Defense

A district court's allocation of the burden of proof is a question of law reviewed *de novo*.  *United States v. Hernandez-Franco*, 189 F.3d 1151, 1157 (9th Cir. 1999) (citing *United States v. Meraz-Solomon*, 3 F.3d 298, 299 (9th Cir. 1993)).  Whether a jury instruction misstates the law, an element of the crime, or the burden of proof is similarly subject to *de novo* review.  *United States v. McKittrick*, 142 F.3d 1170, 1177 (9th Cir. 1998); *United States v. Rubio-Villareal*, 927 F.2d 1495, 1500 (9th Cir. 1991).  However, when a defendant on appeal alleges an error with a jury instruction but had neither requested the instruction be given nor objected to its omission, the court reviews for plain error. *United States v. Bear*, 439 F.3d 565, 568 (9th Cir. 2006).

## A

A criminal defendant is entitled to jury instructions related to a defense theory so long as there is "any foundation in the evidence." *United States v. Burt*, 410 F.3d 1100, 1103 (9th Cir. 2005).  This entitlement is not unlimited, however, and any given instruction must be supported by law.  *See, e.g.*, *United States v. Johnson*, 459 F.3d 990, 992 (9th Cir. 2006).  Doe's proposed jury instruction - that the government bore the burden of disproving public authority beyond a reasonable doubt - was not supported by law, and thus it was not error for the district court to refuse the instruction.

This court has held that "[i]f a defense negates an element of the crime, rather than mitigates culpability once guilt is proven, it is unconstitutional to put the burden of proof on the defendant." *Walker v. Endell*, 850 F.2d 470, 472 (9th Cir. 1987); *see also Patterson v. New York*, 432 U.S. 197, 210 (1977). Not every affirmative defense, however, negates an element of the crime. *See Patterson*, 432 U.S. at 210 ("Proof of the nonexistence of all affirmative defenses has never been constitutionally required . . . ."). In *Dixon v. United States*, 548 U.S. 1 (2006), the Supreme Court addressed head-on the intersection of affirmative defenses and the allocation of the burden of proof.

In *Dixon*, the defendant was indicted for receiving a firearm while under indictment and for making false statements in connection with the acquisition of a firearm; at trial, she put forth a duress defense. 548 U.S. at 3, 4. The district court instructed the jury that Dixon had "'the burden of proof to establish the defense of duress by a preponderance of the evidence.'" *Id.* at 5 (quoting the record appendix). Dixon was found guilty on all counts and appealed, arguing that the jury was incorrectly instructed on the burden of proof. *Id.* at 4, 5. Specifically, Dixon argued that the government was required to disprove her duress defense beyond a reasonable doubt because the duress exerted on Dixon prevented her from freely choosing to commit the acts in question, and thus she lacked the necessary *mens rea*. *Id.* at 4, 6. Because this would negate an element of the crime, she reasoned, the burden rested on the government to disprove the defense. *Id.* at 6. The Supreme Court disagreed. *Id.* at 8.

The Court explained that Congress has moved away from the general/specific intent dichotomy in favor of a more

defined hierarchy of culpability. *Id.* at 7. When a crime requires that a defendant act "knowingly," all that the government must prove is "'knowledge of the facts that constitute the offense.'" *Id.* at 5 (quoting *Bryan v. United States*, 524 U.S. 184, 193 (1998)). Thus, regardless of whether Dixon's will was overborne by duress, she still knew she was making false statements and receiving a firearm while under indictment. *Id.* at 6. Proof of this was sufficient to support the conviction because while Dixon's defense

> may excuse conduct that would otherwise by punishable, [] the existence of duress normally does not controvert any of the elements of the offense itself. . . . Like the defense of necessity, the defense of duress does not negate a defendant's criminal state of mind when the applicable offense requires a defendant to have acted knowingly or willfully; instead, it allows the defendant to "avoid liability . . . because coercive conditions or necessity negates a conclusion of guilt even though the necessary *mens rea* was present."

*Id.* at 6-7 (quoting *United States v. Bailey*, 444 U.S. 394, 402 (1980)).

The Supreme Court emphasized that affirmative defenses have always been treated this way. It explained that "at common law, the burden of proving 'affirmative defenses - indeed, "all . . . circumstances of justification, excuse or alleviation" - rested on the defendant.'" *Id.* at 8 (quoting *Patterson*, 432 U.S. at 202 (quoting 4 W. Blackstone, Commentaries *201)). In the absence of Congressional

action to the contrary, therefore, "it is up to the federal courts to effectuate the affirmative defense of duress as Congress 'may have contemplated' it in an offense-specific context." *Id.* at 17 (internal citation omitted).  The Court concluded that "as will usually be the case, given the long-established common-law rule . . . Congress intended the petitioner to bear the burden of proving the defense of duress by a preponderance of the evidence."  *Id.*

**B**

The question of whether *Dixon* applies to affirmative defenses other than duress is a matter of first impression in the Ninth Circuit.  The Seventh Circuit, in a case very similar to this one, has found that *Dixon* applied to the public authority defense. *See United States v. Jumah*, 493 F.3d 868 (7th Cir. 2007).  In *Jumah*, the defendant was charged with "knowing possession of a listed chemical, knowing, or having reasonable cause to believe, that the chemical would be used to manufacture a controlled substance . . . ." *Id.* at 870. Applying *Dixon*, the *Jumah* court explained that

> The public authority defense is an affirmative defense of excuse derived from the common law.  It is grounded in the principle that prosecuting an individual who acts in reliance upon official statements that one's conduct is lawful offends due process. Like the statute involved in Dixon [sic], the required mental state for an offense under 21 U.S.C. § 841(c)(2) is that the defendant act "knowingly."  Generally, the prosecution meets its burden with respect to this mental state when it proves beyond a reasonable

doubt that the defendant had knowledge of the facts constituting the offense. As noted above, common law affirmative defenses of excuse do not controvert this mental state. Thus, the public authority defense, as an affirmative defense of excuse, does not controvert an essential element of the offense with which Mr. Jumah was charged and does not, of its own force, place the burden on the Government to disprove the defense beyond a reasonable doubt in order to prove his guilt.

At common law, the burden of proof for all affirmative defenses of justification and excuse rests on the defendant. Because the public authority defense is an affirmative defense based on excuse, we must conclude that Congress intended the burden to rest on the defendant to prove the defense by a preponderance of the evidence.

*Id.* at 874-75 (internal citations and footnote omitted). The Sixth Circuit has also commented that a "defendant bears the burden of proving the affirmative public authority defense." *United States v. Theunick*, 651 F.3d 578, 590 (6th Cir. 2011).

We agree with the conclusions reached by the Sixth and Seventh Circuits. The indictment charged Doe with two counts of "knowingly and intentionally conspir[ing] and agree[ing] with other persons" to distribute Schedule II controlled substances and two counts of "knowingly and intentionally possess[ing] with intent to distribute, and aid[ing] and abet[ting] the possession with intent to distribute" Schedule II controlled substances. Like *Dixon*,

each offense accused Doe of "knowingly and intentionally" performing the acts charged, and thus all that the government needed to prove beyond a reasonable doubt was that Doe had knowledge of the facts constituting the charges. *See Dixon*, 548 U.S. at 5; *Bryan*, 524 U.S. at 192, 193. These facts include possessing the contraband and arranging with other drug dealers to sell it to others. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846; 18 U.S.C. § 2.

Doe's defense does not negate his knowledge of any of these facts. Doe did not argue that he did not know he possessed the five kilograms of cocaine or the five kilograms of methamphetamine; nor did he argue that he did not intend to distribute those drugs to local drug dealers. He also never denied conspiring or agreeing with his co-defendant drug dealers to possess and distribute the contraband in the United States. To the contrary, though he disagreed over some of the details, Doe conceded all of these facts, acknowledging that he knew he was conducting these illegal acts, and readily admitted that he did so intentionally. Doe's defense was not lack of knowledge that these transactions were occurring or lack of intent for the deals to go through. Rather, Doe's defense was that he believed he was working for the FBI and was conducting these admittedly illegal actions to obtain information which he could then parlay into safe passage into the United States for himself and his family. The problem with Doe's argument is that even if the jury had accepted his public authority defense, no element of any of the charges would have been negated. Instead, Doe's defense would have simply "excuse[d] conduct that would otherwise be punishable." *Dixon*, 548 U.S. at 6. Thus, like Dixon's duress defense, Doe's common-law affirmative defense of public authority must be proven by a preponderance of the evidence. *See id.* at 17; *Patterson*, 432 U.S. at 200-01. The district

court was therefore correct in applying *Dixon* to Doe's public authority defense and requiring Doe, and not the government, to bear the burden of proof.

Doe relies on a number of pre-*Dixon* decisions of this court for the proposition that the public authority defense "negates criminal intent" for offenses requiring that the defendant act "knowingly," and is therefore an element which must be disproved by the government beyond a reasonable doubt. *See, e.g.*, *United States v. Davis*, 76 F.3d 311, 314 (9th Cir. 1996); *United States v. Mason*, 902 F.2d 1434, 1439-40 (9th Cir. 1990). In this line of cases, we held that if a jury found that a defendant violated criminal law "while acting as an agent for the law enforcement authority, or even if he had a mistaken, but reasonable, belief that he was so acting, then the jury would have to exonerate him." *Mason*, 902 F.2d at 1439-40. The reasoning underlying those holdings was that, if the defendant acted with public authority, then "the jury could not have found the necessary intent to convict of the crime." *Id.* at 1440 (construing *United States v. Ramirez*, 710 F.2d 535, 543-44 (9th Cir. 1983)).

However, these cases were all decided before *Dixon*. *Dixon*'s reasoning - that Congress has moved away from the specific/general intent dichotomy and that crimes requiring that a defendant act "knowingly" simply require the government to prove knowledge of the facts constituting the offense - changed the legal landscape in this area as applied to crimes with a "knowingly" *mens rea*. To the extent that our prior decisions contradict *Dixon*, their holdings are irreconcilable with *Dixon* and are no longer good law. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (explaining that a circuit panel can overrule prior decisions when "the relevant court of last resort [has]

undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable"). Although *Dixon* involved duress, not public authority, its logic equally applies to both. *See id.* ("We hold that the issues decided by the higher court need not be identical in order to be controlling.").

This is not to suggest that there is a *per se* rule that the public authority defense must always be proven by the defendant by a preponderance of the evidence. To the contrary, the burden of proof for the public authority defense depends on both the statute at issue and the facts of the specific case. *Dixon* held only that

> when a statute is silent on the question of affirmative defenses and when the affirmative defense does not negate an essential element of the offense, we must presume that the common law rule that places the burden of persuasion on the defendant reflects the intent of Congress.

*Jumah*, 493 F.3d at 873 (citations omitted). Accordingly, when confronted with an affirmative defense, the court must always look closely to the statutory language of the specific offense charged and determine

> (1) whether the public authority defense negates an element of the charged offense that the Government must prove beyond a reasonable doubt and (2) whether Congress

> intended to alter the common law rules governing the public authority defense [in the statute at issue].

*Id.*

Here, however, Doe was charged with federal possession and conspiracy offenses for which Congress has adopted a "knowingly" *mens rea* requirement, as it did in *Dixon*. *See* 21 U.S.C. § 841(a)(1) ("knowingly or intentionally"); *United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009) (explaining that to prove drug conspiracy, the government must prove "the intent to commit the underlying offense" (internal quotation marks omitted)). The statutes do not contain any indication of Congressional intent to alter the common law public authority defense as to these offenses. Given that Congressional silence, under *Dixon*, "we must presume that the common law rule that places the burden of persuasion on the defendant reflects the intent of Congress." *Jumah*, 493 F.3d at 873.

Nor, in Doe's case, did his proposed version of the public authority defense negate any other element of the offenses for which he was charged. For example, one element of drug conspiracy is conspiratorial agreement, *i.e*, "an agreement to accomplish an illegal objective." *Reed*, 575 F.3d at 923. There may be some circumstances under which a version of the public authority defense might negate that element of conspiracy - for instance, if a defendant's defense was that he was setting up a sting and never intended the drug transaction to be consummated. Here, however, Doe's defense was not that he did not intend for the drug transactions to go through, but rather that he did intend them to go through so that he could provide information about them to the FBI.

## C

Doe makes the alternative argument that, even assuming *Dixon* does apply and Doe did bear the burden of proof by a preponderance of evidence, the district court committed reversible error by not instructing the jury on the burden of proof for the public authority defense. This issue is not preserved, however, as Doe neither objected to the district court's failure to instruct the jury on the burden of proof nor did he request the jury be so instructed.[3] As a result, we review for plain error. *United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir. 1989).

Plain error occurs when there is (1) an error; (2) that is plain; (3) that affects substantial rights; and, if (1)-(3) are met, (4) seriously affects the fairness, integrity, or public reputation of the proceeding. *Bear*, 439 F.3d at 568 (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). An error affects a defendant's substantial rights when it "affect[s] the outcome of the proceedings." *Id.* at 569 (quoting *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000)).

As discussed above, the district court properly concluded that *Dixon* applies to Doe's public authority defense, and thus Doe bore the burden of proof by a preponderance of the evidence. The court's failure to inform the jury of this allocation was undoubtedly an error - one that we believe was

---

[3] Doe did object to the district court's decision not to instruct that the *government* bore the burden beyond a reasonable doubt, but that is a different objection and is not enough to preserve the current issue. *See United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir. 1989) (objecting to an instruction generally and to a different part of that instruction specifically does not satisfy preservation of an objection to another part of that instruction).

obvious, and thus "plain." *See United States v. Olano*, 507 U.S. 725, 732 (1993). However, there is nothing in the record to suggest that the outcome would have been any different had the jury been properly instructed. The government presented a very strong case against Doe, while Doe presented an extremely weak defense. Even if one were to assume the jury believed everything he said, Doe's reliance on public authority was shaky at best, because he never suggested that he was specifically authorized or directed to carry out these particular crimes, or, indeed, any crimes at all.

Moreover, it is entirely likely that the trial judge's error actually helped Doe. The only reference to the burden of proof in the jury instructions was at the very beginning of the instructions, where the district court stated, "The defendant is presumed to be innocent and does not have to testify or present any evidence to prove innocence. The government has the burden of proving every element of the charges beyond a reasonable doubt." When the judge instructed on public authority, all he said was that "[i]f a person engaged in conduct that violated a criminal statute, in reliance on a statement or act of a government official, with a reasonable belief that the defendant is acting as an authorized government agent to assist in law enforcement activity, then the defendant may not be convicted of violating the criminal statute." Nothing in this latter instruction spoke of the standard or the burden of proof. Taking the instructions as a whole, and presuming, as we must, that the jurors followed the instructions as given, *see United States v. Heredia*, 483 F.3d 913, 923 (9th Cir. 2007), it is reasonable to conclude that the jury (incorrectly) perceived that the government retained the burden of disproving Doe's public authority defense beyond a reasonable doubt. Thus, if anything, this error resulted in Doe receiving the instruction he fought for

in an indirect manner.[4]  *See Jumah*, 493 F.3d at 878 (explaining that where the court failed to inform the jury that the defendant bore the burden of proof for the public authority defense, "a jury faithfully following the instructions, *as given by the district court*, would have understood, in all likelihood, that the Government had the burden of disproving the [public authority] affirmative defense . . . .  In short, Mr. Jumah received, in all likelihood, an unwarranted benefit from the court's instructions.").

Considering the weakness of Doe's affirmative defense, the strength of the government's case, and the potential benefit Doe received from the error, we cannot say that this error was prejudicial and affected the jury's verdict.  Because Doe's substantial rights were not affected, we do not reach the fourth prong of the plain error analysis.  Thus, the district court's error in failing to instruct the jury on the burden of proof for the public authority defense was not plain error, and reversal is not warranted.

## II.  The Sixth Amendment Claim

We review whether a defendant was denied his or her Sixth Amendment right to the assistance of counsel *de novo*. *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998). However, we must give "great latitude" and "broad discretion" to the presiding judge when reviewing the lower court's decision to limit and control closing summations. *Herring v. New York*, 422 U.S. 853, 862 (1975).

---

[4]  It is entirely possible that Doe recognized this, and thus his failure to request the instruction was a tactical decision.  We have no explanation, however, for why the government did not request the instruction be given.

**A**

Doe alleges that the district court deprived him of his Sixth Amendment right to counsel by preventing him from arguing during closing argument that the government had the burden of disproving his public authority defense beyond a reasonable doubt. We disagree.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. As part of this essential Constitutional right, "there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments." *Herring*, 422 U.S. at 857. Chief among these traditions is the ability of defense counsel "to make a closing summation to the jury." *Id.* at 858, 862. Importantly, this right is not unlimited, and a court may limit closing arguments to ensure that they "do[] not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.* at 862; *see also Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000).

Doe's argument is a derivative of his argument regarding the allocation of the burden of proof for the public authority defense discussed above. The district court did not forbid Doe from making a closing argument or from presenting his public authority theory; it merely prevented him from arguing incorrect statements of law, something that is well within the court's discretion. *See Herring*, 422 U.S. at 860 ("The Constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a *proper argument* on the evidence and the *applicable*

*law* in his favor . . . ." (quoting *Yopps v. State*, 178 A.2d 879, 881 (Md. 1962)) (emphasis added)).  Indeed, any other ruling would have allowed Doe to circumvent the district court's ruling on the applicability of *Dixon* to the public authority defense.   The district court, therefore, did not err in prohibiting Doe from arguing that the government needed to disprove public authority beyond a reasonable doubt.

## III.    The Discovery & *Brady* Claims

The scope of discovery is within the district court's discretion, so we review discovery rulings for an abuse of discretion.  *United States v. Clegg*, 740 F.2d 16, 18 (9th Cir. 1984).   To find an abuse of discretion, we must "have a definite and firm conviction that the district court committed a clear error of judgment."  *United States v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000).  The alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963), however, are reviewed *de novo*.  *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010).

## A

Rule 16 of the Federal Rules of Criminal Procedure grants defendants a broad right to discovery, providing that "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph . . . documents . . . within the government's possession, custody, or control  . . .  [that are]  material  to  preparing  the defense . . . ."  Fed. R. Crim. P. 16(a)(1)(E)(i).  To receive discovery under this Rule, the defendant "'must make a threshold  showing  of  materiality,  which  requires  a presentation of facts which would tend to show that the Government is in possession of information helpful to the

defense.'" *Stever*, 603 F.3d at 752 (quoting *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995)); *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1985). Assuming a discovery violation occurred, reversal is only appropriate if the defendant shows "a likelihood 'that the verdict would have been different had the government complied with the discovery rules.'" *Chon*, 210 F.3d at 994-95 (quoting *United States v. de Cruz*, 82 F.3d 856, 866 (9th Cir. 1996)).

     Here, Doe argues the district court abused its discretion in denying two of Doe's discovery requests - Request Five and Request Six. In Request Five, Doe sought "[a]ny and all records or reports which document any and all telephone numbers, license plate numbers, or individuals, provided or identified by [Doe] to FBI [agents], as being associated, involved or related to criminal activity." According to Doe, this information was important and necessary "evidence that [Doe] provided the FBI information regarding criminal activity and is not predisposed to commit the acts alleged, but rather, he was predisposed to assist law enforcement." In Request Six, Doe requested "[a]ny and all records, reports or calendars which document the date of any meeting or communication, or planned meeting or communication, between [Doe] and FBI [agents]." Doe contended that this information was "material to preparing, and necessary to put forth, an entrapment defense." The district court denied both requests because "they are overbroad. The Court [could not] determine whether the requests do or do not fall within the express words of Rule 16(a)(1)(E)(i)."

     It is unclear to us how the district court came to this conclusion. The requests are not overbroad at all, but rather well tailored, explaining the specific information Doe was requesting and the types of documents that would likely

contain the information he sought. Considering the FBI agents only met and/or spoke with Doe on a handful of occasions, the time frame of the requests is similarly well-known. Unless Doe had knowledge of specific FBI documents he could point to by name and date of creation, a scenario we highly doubt existed, Doe's requests could not have been any more pointed. Thus, the district court's determination that these requests were overbroad was a clear error of judgment.

Moreover, Doe consistently argued throughout the prosecution that he believed his actions were sanctioned by the FBI. The documents he requested - any records or reports containing information Doe relayed to the FBI regarding illegal activity and any FBI calendars or other documents showing planned meetings with Doe - would undoubtedly have been helpful to his defense. The documents, if they existed, could have been used by Doe to help establish his state of mind. They could have been used by the jury in their determination of whether the public authority defense was established, or whether Doe's belief that he was working with the FBI was reasonable. They most certainly could have been used to impeach the FBI agent at trial. And, at the very least, they could have helped to establish Doe's credibility. The list of potential uses of these documents goes on and on. For the district court to say that it could not determine whether the requests fell under Rule 16(a)(1)(E)(i) is to say that it is unclear if the documents were "material to preparing the defense." This conclusion, however, is not correct, especially considering that "[e]vidence is relevant if it has '*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Stever*, 603 F.3d at 753 (quoting Fed. R. Evid. 401).

The government makes two arguments which warrant a response. First, it contends that Doe had the opportunity to follow-up on these requests but did not. Specifically, following the court's denial of Doe's motion, Doe told the court he would file a new motion seeking "more specific information" but never did, despite filing additional unrelated discovery requests. Also, Doe never inquired into the existence of this information when examining the FBI agent at trial. While the government is correct that Doe could have, and perhaps should have, done these things, the failure to do so is irrelevant to the issue before us: whether the district court abused its discretion in denying Request Five and Request Six.

Second, the government argues that Request Six sought information to prepare an entrapment defense, a defense which is very different from the public authority defense Doe put forth at trial. Considering Doe abandoned this defense, the government avers, the judge could not have abused his discretion in finding the request did not satisfy Rule 16. Again, the government misses the point. At the time of the request, Doe *was* preparing an entrapment defense. The question is whether the information would have helped Doe in this endeavor, not whether the information would ultimately prove an entrapment defense. Even if the documents caused Doe to completely abandon the entrapment defense and take an entirely different path, the documents would still have been "material to preparing the defense" under Rule 16(a)(1)(E)(i).

The district court's decision to deny Requests Five and Six was a clear error of judgment, and thus an abuse of discretion. *See Stever*, 603 F.3d at 752; *Chon*, 210 F.3d at 994.

**B**

Even though the district court abused its discretion, Doe's conviction will not be reversed unless he can show that he would have been acquitted had the judge granted the requests and the materials been disclosed. *Chon*, 210 F.3d at 994-95. This is impossible for Doe to do, since the documents have yet to be turned over, if they even exist at all.[5] Thus, we must vacate Doe's conviction and remand to the district court for further proceedings on "whether the Government's documents in fact contain, or would have led to, information that might have altered the verdict." *See Stever*, 603 F.3d at 754-55 (citing *United States v. Alvarez*, 358 F.3d 1194, 1209 (9th Cir. 2004)). If the district court determines that the documents sought in Requests Five and Six exist and contain "probative, relevant, and material information" that "probably would have changed the outcome" of the trial, the district court must grant Doe a new trial. *See Alvarez*, 358 F.3d at 1209 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 (1987); *United States v. Strifler*, 851 F.2d 1197, 1202 (9th Cir. 1988)). On the other hand, if the district court determines that the documents do not exist, or that, even if they do exist, the failure to disclose them was harmless, the district court shall reinstate Doe's conviction. *See id.*

---

[5] At the hearing on Doe's motion for a new trial, the district court stated that there was no violation because the "government's position then, and continues to be, [was] that they had no information at all that [Doe] did provide information about anyone named Indio." This position is relevant, but not determinative, with respect to Request Five because the request sought all information Doe provided to the FBI, which necessarily includes, but is not limited to, the "Indio" information. However, with respect to Doe's *Brady* claim related to "Indio," we agree with the district court and find no violation.

## C

Doe also argues that the government failed to discharge its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, which recognize the constitutional duty of the government to disclose exculpatory evidence to a defendant if it is "material" to guilt or punishment. *Id.* at 87-88; *see also Paradis v. Arave*, 240 F.3d 1169, 1176 (9th Cir. 2001). To establish a *Brady* violation, three elements must be satisfied: (1) the evidence must be favorable to the accused; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) there must be prejudice as a result of the suppression. *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011).

Suppressed evidence is considered prejudicial (or material) if "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Paradis*, 240 F.3d at 1176 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" exists when confidence in the outcome is undermined. *Id.* Material evidence includes exculpatory evidence and impeachment evidence. *Kohring*, 637 F.3d at 903; *Paradis*, 240 F.3d at 1179.

Here, Doe's *Brady* allegations are based on the same materials as his discovery complaints. As with those violations, it is impossible for us to evaluate Doe's claim because we do not know what the documents say, if they exist at all. As a result, we will adopt a similar approach and remand to the district court for further proceedings "to determine whether the government ha[s] discharged its obligation to provide the defense with material exculpatory evidence, including impeachment evidence, within its

possession." *Alvarez*, 358 F.3d at 1209 (citing *United States v. Bernal-Obeso*, 989 F.2d 331, 335-36 (9th Cir. 1993)). While this directive seems repetitive of the evidentiary hearing described above, there is one important difference: the standard of review if the documents exist. To grant Doe a new trial on the discovery violations, the district court must find a "likelihood 'that the verdict would have been different'" had the documents been disclosed. *See Chon*, 210 F.3d at 994-95 (quoting *de Cruz*, 82 F.3d at 866). To grant Doe a new trial on a *Brady* violation, however, the district court must merely determine that the documents, if favorable to Doe, undermine its confidence in the outcome and that there is a "reasonable probability" of a different result. *See Bagley*, 473 U.S. at 682; *Paradis*, 240 F.3d at 1176. This is a much relaxed standard, and thus it is possible that Doe could be granted a new trial on *Brady* but not discovery grounds. *See Stever*, 603 F.3d at 755 n.2.

## IV.    The Sentence[6]

Sentencing decisions and procedures are normally reviewed for an abuse of discretion. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008). However, when the defendant does not object to the sentencing procedures at the time of sentencing, as is the case here, we review for plain error. *United States v. Valencia-Barragan*, 608 F.3d 1103, 1108 (9th Cir. 2010). On appeal, only an unreasonable sentence - either procedurally or substantively - will be set aside. *Carty*, 520 F.3d at 993 (citing *Rita v. United States*,

---

[6] Assuming the district court finds no prejudicial *Brady* or discovery violations and Doe's conviction is reinstated, the issue of the procedural reasonableness of Doe's sentence would still remain. To avoid unnecessary repetition and relitigation, we address those allegations now.

551 U.S. 338, 341 (2007)); *see also Gall v. United States*, 552 U.S. 38, 46 (2007).

## A

In *Carty*, this court provided the district courts with a step-by-step process to follow at sentencing proceedings. 520 F.3d at 990-94. Sentencing is "to begin by determining the applicable Guidelines range. . . . [which] must be calculated correctly." *Id.* at 991. Once this "starting point" is established, the parties must be given a chance to argue for an appropriate sentence. *Id.* Then, in evaluating the parties' arguments, the court must "consider the § 3553(a) factors." *Id.* While it is not necessary for the district court to "tick off" each of the factors, "when a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor . . . [,] the judge should normally explain why he accepts or rejects the party's position." *Id.* at 992-93. Once the sentence is decided, the judge must explain the sentence "sufficiently to permit meaningful appellate review." *Id.* at 992.

In addition to the procedures laid out in *Carty*, sentencing courts are bound by Rule 32 of the Federal Rules of Criminal Procedure. Under Rule 32, the sentencing court "must - for any disputed portion of the presentence report or other controverted matter - rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The Ninth Circuit has mandated "strict compliance" with Rule 32, explaining that the rulings must be "'express' or 'explicit.'" *United States v. Houston*, 217 F.3d 1204, 1208 (9th Cir.

2000) (citing *United States v. Karterman*, 60 F.3d 576, 583 (9th Cir. 1995)).

## B

Here, the district court did not follow this guidance, and the result was a sentencing hearing which contained numerous procedural violations, the cumulative effect of which renders Doe's sentence procedurally unreasonable.[7]

First, the district judge stated that "the applicable offense level is 38, Criminal History Category is I. Guideline range is 292 to 365." This statement was incorrect. According to the PSR, Doe's base offense level was thirty-eight and his total offense level was forty. Under the Sentencing Guidelines, the range for an offense level of forty is 292 to 365 months; the range for an offense level of thirty-eight, meanwhile, is 235 to 293 months. *See* U.S. Sentencing Guidelines Manual ch. 5, pt. A (2010). While the government attempts to gloss over this error and characterize it as a simple misstatement of the offense level, we are not so sure. That is definitely one possibility, in which case the stated Guidelines range is correct. Equally plausible, however, is that the district judge had decided to adopt Doe's objection to the PSR and not impose the two-point organizer enhancement.[8] In this latter alternative, the district court properly stated the offense level but misstated the Guidelines range. There is no way to know with certainty where the

---

[7] Doe does not challenge the substantive reasonableness of his sentence, and we need not address it here.

[8] As we explain below, this possibility is not far-fetched, considering the weakness of the evidence supporting the organizer enhancement.

error occurred.  Either way, the Guidelines are the "starting point and the initial benchmark" of sentencing, *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49), and the failure accurately to state the Guidelines range at the onset derailed the sentencing proceeding before it even began.[9]

Second, the district judge never gave the parties the opportunity to "argue for a sentence they believe is appropriate."  *Carty*, 520 F.3d at 991.  After stating the inconsistent offense level and Guidelines range, the judge stated he had "some questions" and proceeded to inquire into the issue of sentence disparity between Doe and the Dinuba Contact and the issue of Doe's acceptance of responsibility. Though Doe may disagree with the judge's ultimate findings, there can be no real dispute that the district court adequately covered these two topics.  The problem, however, is the judge never gave the parties an opportunity to argue the significance of these rulings; neither Doe nor the government was able to stand before the court and recommended a sentence.[10]  Thus, we are left without meaningful debate between the parties as to what sentence the judge should have

---

[9]  Indeed, the district judge sentenced Doe to the bottom of the applicable Guidelines range.  If it was his intent to impose the minimum sentence possible without varying from the Guidelines or granting any downward adjustments, and he meant to apply an offense level of thirty-eight, then this single misstatement resulted in Doe being mistakenly sentenced to an additional fifty-seven months imprisonment.

[10]  Of course, *Carty* only requires that the parties be given a *chance* to argue for a specific sentence.  520 F.3d at 991.  No procedural error would occur if the sentencing judge asked the parties if they wished to make an argument and they declined.  The same would be true if they stated on the record that they wished to rest on the presentence papers.

imposed. Without this debate and on-the-record recommendations, it is impossible for us to conduct an appropriate appellate review and determine whether Doe's sentence is reasonable. *See Carty*, 520 F.3d at 992, 993.

Finally, the district judge seemed to ignore Rule 32 of the Federal Rules of Criminal Procedure and this court's mandate of "strict" compliance. Doe objected to numerous aspects of the PSR, including probation's two-level increase for being an organizer under § 3B1.1(c) of the Guidelines and its recommendation to deny a two-level reduction for the acceptance of responsibility under § 3E1.1(a) of the Guidelines. In addition to these objections, Doe argued for further Guidelines reductions. Specifically, he requested a four-point reduction in the Base Offense Level for playing a mitigating role under § 2D1.1(a)(5), a four-point reduction for being a minimal participant under § 3B1.2(a), and a two-point safety-valve reduction under §§ 2D1.1(b)(11) and 5C1.2(a).[11] All together, his objections and requested reductions create a potential fourteen-point swing with the offense level recommended in the PSR. In practical terms, Doe believed his sentence should have been between sixty-three to seventy-eight months, or approximately twenty years less than the sentence imposed as a result of these Guideline range adjustments, or alternatively as a variance from the Guideline range given the totality of the circumstances presented. *See* U.S. Sentencing Guidelines Manual ch 5, pt A (2010).

---

[11] In his brief, Doe claimed he also argued for a downward variance due to his age, his role as a parent, his vocational training, and his decision to provide information to the FBI. However, nothing in the record supports Doe's claim that he made these arguments, and unlike the objections and requests discussed above, the government did not concede that these arguments were made. As a result, we do not consider them here, though Doe would be free to raise them if he is resentenced.

Yet, with the exception of the acceptance of responsibility issue, none of these matters were adequately addressed. The government makes a strong argument that, based on the parties' answers to the district court's questions in relation to the co-defendant's sentence disparity, the district court implicitly rejected Doe's objections regarding being an organizer and minimal participant and for playing a mitigating role. The government's argument fails, however, because Rule 32(i)(3)(B) requires that "for any disputed portion of the presentence report or other controverted matter," the court must "rule on the dispute or determine that a ruling is unnecessary." And, this court has interpreted this to mean that all Rule 32 findings "must be 'express' or 'explicit.'" *Houston*, 217 F.3d at 1208 (quoting *Karterman*, 60 F.3d at 583). The district court did not do that here, and thus there is no way for us to know how these objections and factual issues affected Doe's sentence, or if they affected it at all. *See United States v. Carter*, 219 F.3d 863, 868 (9th Cir. 2000) ("Because the district court did not explicitly resolve those factual disputes, we have no way of knowing which disputed statements, if any, the district court relied on in making its findings."). Quite simply, even if the district court did implicitly reject Doe's objections, his implicit ruling was insufficient to comply with this court's interpretation of Rule 32. *See id.* ("These statements clearly indicate that the district court disbelieved some of Carter's statements made during the sentencing hearing. But they fall short of an explicit resolution of factual disputes relevant to the role

enhancement, or an explicit indication that the court was not relying on the disputed factual statements.").[12]

   This inadequacy is even more pronounced due to the weak support for any implicit findings the court may have made. The record portrays Doe as a middle-man arranging sales between the informants, acting as drug distributors for the imported contraband, and the Mexican drug cartels. Even the informants testified that Doe facilitated their introduction to the Dinuba Contact so they could then buy the methamphetamine from him. The question during trial was never over Doe's role, but rather whether he was arranging the drug transactions for his own profit and self-interest or as an FBI informant attempting to obtain information in exchange for the right to immigrate to the United States. Based on the record before us, there is inadequate support for

---

[12] The government argued that the district court was not required to make Rule 32 findings because Doe's objections were all legal and not factual. The government is correct that legal objections do not require explicit findings. *See, e.g.*, *United States v. Grajeda*, 581 F.3d 1186, 1188 (9th Cir. 2009). However, Doe's objections are clearly factual; the distinctions between the objections at issue here and the objections in the cases the government relies on are readily apparent. *Compare United States v. Molina*, 934 F.2d 1440, 1452 (9th Cir. 1991) (holding that the sentencing judge's decision on whether a defendant is a minimal or minor participant "rests heavily on the facts"), *with Grajeda*, 581 F.3d at 1189 ("Grajeda did not controvert the accuracy of the PSR or argue that he had not been convicted . . . . Rather, he argued that . . . the government was required to prove the prior convictions beyond a reasonable doubt . . . ."), *and United States v. Stoterau*, 524 F.3d 988, 1012 (9th Cir. 2008) ("Stoterau did not deny that the police reports contained the information alleged in the PSR or that the information was factually inaccurate. Instead, he argued . . . a general evidentiary legal challenge . . . ."). Moreover, the government's own arguments to support its claim rely on specific facts from trial, from the PSR, and from the sentencing hearing - the same facts Doe is disputing.

the two-point leader and organizer enhancement, especially when one considers the impact of that finding.[13]   If this enhancement is to be imposed, the judge must make made more explicit findings.

## C

Having established that procedural violations occurred, the final question is whether these violations amount to plain error requiring vacatur despite Doe's failure to object to the procedures during sentencing.  We hold that they do.  As discussed in Part I.C, *supra*, for there to be plain error, there must be:  (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the proceeding.  *Johnson*, 520 U.S. at 466-67 (quoting *Olano*, 507 U.S. at 732).

Here, the procedural violations constitute material errors. *See, e.g.*, *Carty*, 520 F.3d at 993 ("It would be procedural error for a district court . . . to calculate incorrectly . . . the Guidelines range."); *see also United States v. Showalter*, 569 F.3d 1150, 1159 (9th Cir. 2009); *United States v. Ingham*, 486 F.3d 1068, 1074 (9th Cir. 2007) ("It is well settled in this circuit that when the district court fails to make the required Rule 32 findings or determinations at the time of sentencing, we must vacate the sentence and remand for resentencing.") (quoting *Carter*, 219 F.3d at 866).  It is also clear that these errors affected Doe's substantial rights and seriously affected the fairness of the proceedings in as much as Doe's various objections and arguments, all of which could substantially

---

[13]   An organizer enhancement automatically forecloses safety-valve eligibility.  *See* U.S. Sentencing Guidelines Manual § 5C1.2(a)(4) (2010).

affect his ultimate sentence, were never properly considered or ruled upon.

Therefore, we hold that the cumulative effect of the procedural violations that took place during Doe's sentencing hearing amounts to plain error, and his sentence must be vacated. *See, e.g.*, *Showalter*, 569 F.3d at 1159; *Ingham*, 468 F.3d at 1074.

## Conclusion

The district court was correct in applying *Dixon v. United States* to Doe's public authority defense, and thus the district court's determination that Doe bore the burden of proof by a preponderance of the evidence was proper. For that reason, Doe was not denied his Sixth Amendment right to the assistance of counsel when the district court prohibited him from arguing a different burden and standard of proof during closing arguments. The district court did, however, err when it failed to instruct the jury at all on the proper burden and standard of proof for the public authority defense. But, because Doe never raised this argument in the district court, it is subject to plain error analysis, and the error does not satisfy this high standard.

With respect to the alleged discovery violations, the district judge abused his discretion in denying Requests Five and Six, and the government's failure to disclose this information may have been a violation of *Brady v. Maryland*. However, we do not know what information those documents contain, or if they exist at all, and thus we are unable to determine the effect of the failure to disclose. Thus, Doe's conviction is vacated and remanded for proceedings consistent with this opinion.

Finally, assuming the proceedings on the discovery and *Brady* issues result in the reinstatement of Doe's conviction, his sentence is to be vacated and he is to be resentenced in accordance with the procedures laid out in *Carty* and this opinion.

The district court is **AFFIRMED IN PART** and **REVERSED IN PART**. Doe's conviction is hereby **VACATED** and **REMANDED** for further proceedings not inconsistent with this opinion.